**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **GOLDEN GATE SALMON ASSOCIATION, NATURAL RESOURCES DEFENSE COUNCIL, INC., DEFENDERS OF WILDLIFE, BAY.ORG d/b/a THE BAY INSTITUTE,**<br><br>**Plaintiffs,**<br><br>vs.<br><br>**WILBUR ROSS, in his official capacity as Secretary of Commerce, CHRIS OLIVER, in his official capacity as Assistant Administrator for Fisheries at the National Oceanic and Atmospheric Administration; and NATIONAL MARINE FISHERIES SERVICE,**<br><br>**Defendants.** | **Case No. 1:17-cv-01172 LJO-EPG**<br><br>**MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION TO COMPLETE THE ADMINISTRATIVE RECORD (ECF NO. 42)** |

## I. <u>INTRODUCTION</u>

On June 29, 2017, Plaintiffs, a coalition of environmental interest groups, filed the currently operative Complaint, which includes a single claim brought under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*., and the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq*., against the National Marine Fisheries Service ("NMFS"), an office of the National Oceanic and Atmospheric Administration ("NOAA") within the U.S. Department of Commerce, as well as the Secretary of Commerce and the Acting Administrator of NOAA (collectively, "Federal Defendants").

1

ECF No. 1. The Complaint concerns NMFS's Biological Opinion ("BiOp"), issued under Section 7 of the ESA, regarding the impacts of California's proposed WaterFix project ("WaterFix") on various ESA-listed species, including the endangered Sacramento River winter-run Chinook salmon ("winter-run") and threatened Central Valley spring-run Chinook salmon ("spring-run"). *Id.* It is alleged that as part of WaterFix, the Bureau of Reclamation ("Bureau" or "Reclamation") and the California Department of Water Resources ("DWR") proposed to construct three new water intakes on the Sacramento River, each capable of diverting 3,000 cubic feet per second ("cfs") of water. *Id.* at ¶ 2. The Bureau and DWR also propose to construct two tunnels that will transport water from these intakes to existing pumping plants in the South Delta, bypassing up to 9,000 cfs of water underneath (instead of through) the Sacramento-San Joaquin River Delta. *Id.*

Federal Defendants lodged the administrative record ("AR") on March 15, 2018. ECF Nos. 40 & 41. Plaintiffs now move for inclusion of certain additional documents in the AR. ECF No. 42. Federal Defendants oppose the motion, ECF No. 45, and, after the parties stipulated to continue the hearing on the motion, ECF No. 47, Plaintiff's filed a reply on April 27, 2018. ECF No. 48. Having deemed the matter suitable for decision on the papers pursuant to Local Rule 230(g), ECF No. 49, the Court hereby GRANTS IN PART AND DENIES IN PART Plaintiffs' motion and requests supplemental briefing on one issue.[1]

## II. **BACKGROUND**

The present dispute involves documents created under the auspices of various sections of the ESA, as well as the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, and the California Environmental Policy Act ("CEQA"), Cal. Pub. Res. Code §§ 21000 *et seq.* "Under the ESA,

---

[1] The Court notes that the issuance of an order on this motion was delayed significantly by the facts that the briefs: (a) do not clearly delineate in an organized manner the documents remaining at issue; and (b) incorporate by reference large amounts of argument and explanation contained within lengthy declarations, meaning that in every practical sense both sides exceeded by large margins the page limits imposed by this Court's standing order. While reference to declarations is of course necessary in many instances, they are meant to support, not supplant, briefs.

the Secretary of the Interior and the Secretary of Commerce are charged with identifying threatened and endangered species and designating critical habitats for those species." *Nat. Res. Def. Council v. Jewell*, 749 F.3d 776, 779 (9th Cir. 2014) (citing 16 U.S.C. § 1533). NMFS and the U.S. Fish and Wildlife Service ("FWS") administer the ESA on behalf of the Departments of the Commerce and Interior, respectively[2]. *See* 50 C.F.R. §§ 17.11, 222.101(a), 223.102, 402.01(b). The district court in *Environmental Protection Information Center, Inc. v. Pacific Lumber Co*., summarized succinctly the relationship between the sections of the ESA pertinent to the present motion:

> Section 9 of the ESA makes it unlawful for any person to "take," i.e., to harm, kill or harass, any listed endangered species of fish or wildlife within the United States unless an incidental take permit ("ITP") or other exemption is obtained pursuant to section 10 of the ESA. 16 U.S.C. § 1538. In order to qualify for an ITP, a permit applicant must submit a habitat conservation plan that includes, among other things, the steps an applicant will take to minimize and mitigate impacts on endangered species and alternative actions being considered. 16 U.S.C. § 1539(a)(2)(A).

> Section 7(a)(2) imposes a procedural duty on the federal agencies to consult with the FWS or NMFS, depending on the protected species, to "insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of critical habitats of listed species. 16 U.S.C. § 1536(a)(2). An agency "action" is defined to mean all activities carried out by federal agencies, including, among other things, the granting of licenses and permits. *See* 50 C.F.R. § 402.02. "If a contemplated agency action may affect a listed species, then the agency must consult with the Secretary of the Interior, either formally or informally." *American Rivers [v. NMFS]*, 126 F.3d [1118,] 1122 [(9th Cir. 1997)].

> . . . . An ITP, by its very nature, is issued to a permit applicant because its activities may result in the "taking" of listed species, and therefore, "may affect" those species. *See* 16 U.S.C. § 1539(a); *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1055 (9th Cir. 1994) [].

---

[2] Generally, FWS has jurisdiction over species of fish that either (1) spend the major portion of their life in fresh water, or (2) spend part of their lives in estuarine waters, if the remaining time is spent in fresh water. *See Cal. State Grange v. Nat'l Marine Fisheries Serv*., 620 F. Supp. 2d 1111, 1120 n.1 (E.D. Cal. 2008), as corrected (Oct. 31, 2008). NMFS is granted jurisdiction over fish species that (1) spend the major portion of their life in ocean water, or (2) spend part of their lives in estuarine waters, if the remaining portion is spent in ocean water. *Id*. FWS exercises jurisdiction over the delta smelt; NMFS exercises jurisdiction over the winter-run and spring-run Chinook salmon.

67 F. Supp. 2d 1113, 1117-18 (N.D. Cal. 1999), *vacated in part on other grounds*, 257 F.3d 1071 (9th Cir. 2001).

More specifically, the ESA Section 7 consultation process normally begins with the preparation by the "action agency" (i.e., the agency proposing the project) of a "biological assessment" ("BA") designed to determine whether any listed species "is likely to be affected" by the action. 16 U.S.C. § 1536(c)(1). If the BA determines that a threatened or endangered species "is likely to be affected," the agency must formally consult with the FWS or NMFS (sometimes referred to generically as "wildlife agencies"). *See id*. § 1536(a)(2); 50 C.F.R. § 402.14. Formal consultation results in the issuance of a BiOp by the relevant wildlife agency. *See id*. § 1536(b).

If the BiOp concludes that the proposed action would jeopardize the species or destroy or adversely modify critical habitat, *see id*. § 1536(a)(2), then the action may not go forward unless the wildlife agency can suggest a "reasonable and prudent alternative[]" ("RPA") that avoids jeopardy, destruction, or adverse modification. *Id*. § 1536(b)(3)(A). If the BiOp concludes that jeopardy is not likely and that there will not be adverse modification of critical habitat, or that there is a RPA to the agency action that avoids jeopardy and adverse modification, and that the incidental taking of endangered or threatened species will not cause jeopardy, the wildlife agency shall issue an "Incidental Take Statement" ("ITS") which, if followed, exempts the action agency from the prohibition on takings found in Section 9 of the ESA. 16 U.S.C. § 1536(b)(4); *Aluminum Co. of Am. v. Administrator, Bonneville Power Admin.*, 175 F.3d 1156, 1159 (9th Cir. 1999).

The document challenged in this case is a BiOp prepared by NMFS in connection with the WaterFix proposal. The WaterFix project is at least in part an outgrowth of several rounds of planning for the long-term operation of the federal Central Valley Project ("CVP") and State Water Project ("SWP"). Presently, the CVP and SWP are operated in coordination according to a Coordinated Operations Agreement ("COA") between Reclamation and DWR. AR A000010. Two BiOps in turn regulate the coordinated CVP/SWP operations: one issued in 2008 by FWS and another issued in 2009

4

by NMFS. *See* AR A000044. Both BiOps contain RPAs designed to avoid jeopardy to listed species. Most relevant to the instant motion is an RPA in the 2009 NMFS BiOp pertaining to Shasta Reservoir operations ("Shasta RPA"). In certain recent drought years, DWR and Reclamation have requested and received permission to deviate from the Shasta RPA. *See* AR C061202-204. In 2017, NMFS proposed an amendment to the Shasta RPA to account for multiple years of drought conditions, new science and modeling, and low population abundance levels of the winter-run and spring run Chinook the Shasta RPA was designed to protect. AR A000018.

WaterFix is at least arguably more directly an outgrowth of a planning effort to develop the Bay Delta Conservation Plan ("BDCP"). AR A000010. The BDCP was originally envisioned as a comprehensive program to "satisfy existing regulatory requirements related to operation of the CVP and SWP and develop a conservation plan for the Delta that would support new regulatory authorizations under state and Federal endangered species laws for current and future activities related to the CVP and SWP." *Id*. In 2013, DWR issued a draft BDCP (a draft habitat conservation plan) and filed an application for an ITP under ESA Section 10. AR A000011. In addition, in cooperation with other relevant regulatory agencies, including NMFS, DWR and Reclamation issued a Draft Environmental Impact Statement/Environmental Impact Report ("DEIS/EIR") pursuant to NEPA and CEQA, evaluating the BDCP and 12 other alternatives. AR A000011.

In February 2015, Reclamation and DWR decided to pursue separately an ESA Section 7 consultation for the construction and operation of the water facilities formerly included within the BDCP as "Conservation Measure 1," in the form of the WaterFix proposal. *See id*. Throughout 2015 and 2016, NMFS provided technical assistance to DWR and Reclamation regarding the development of a BA for WaterFix, which was eventually submitted to NMFS by Reclamation, along with Reclamation's request for initiation of formal consultation under ESA Section 7 regarding WaterFix. AR A000012. On June 16, 2017, NMFS issued the 1,267-page WaterFix BiOp, which concluded that WaterFix is not likely to jeopardize the continued existence of ESA-listed winter-run and spring-run Chinook salmon, or destroy

or adversely modify designated critical habitat for those species. AR A000005, A 001115.

### III. APA RECORD REVIEW RULE

In the context of claims arising under the APA, the scope of judicial review is limited to "the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. 138, 142 (1973). The administrative record is "not necessarily those documents that the agency has compiled and submitted as 'the' administrative record." *Thompson v. U.S. Dept. of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (internal citation omitted). Rather, "'[t]he whole record' includes everything that was before the agency pertaining to the merits of the decision." *Portland Audubon Soc'y v. Endangered Species Comm.*, 984 F.2d 1534, 1548 (9th Cir. 1993) (internal citation omitted). "The 'whole' administrative record, therefore, consists of all documents and materials directly or indirectly considered by agency decision-makers and includes evidence contrary to the agency's position." *Thompson*, 885 F.3d at 555 (emphasis added).

> An incomplete record must be viewed as a fictional account of the actual decisionmaking process. When it appears the agency has relied on documents or materials not included in the record, supplementation is appropriate.

*Portland Audubon*, 984 F.2d at 1548 (internal quotations and citations omitted). "A satisfactory explanation of agency action is essential for adequate judicial review, because the focus of judicial review is not on the wisdom of the agency's decision, but on whether the process employed by the agency to reach its decision took into consideration all the relevant facts." *Asarco, Inc. v. U.S. Environmental Protection Agency*, 616 F.2d 1153, 1160 (9th Cir. 1980)."

However, the record does not include "every scrap of paper that could or might have been created" on a subject. *TOMAC v. Norton*, 193 F. Supp. 2d 182, 195 (D.D.C. 2002).

> A broad application of the phrase "before the agency" would undermine the value of judicial review: Interpreting the word "before" so broadly as to encompass any potentially relevant document existing within the agency or in the hands of a third party would render judicial review meaningless. Thus, to ensure fair review of an agency decision, a reviewing court should have before it neither more nor less information

than did the agency when it made its decision.

*Pac. Shores Subdivision v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 5 (D.D.C. 2006) (internal citations and quotations omitted).

## IV. <u>DISCUSSION</u>

**A.**     <u>Presumption of Completeness</u>

An agency's designation and certification of the administrative record is entitled to a "presumption of administrative regularity." *McCrary v. Gutierrez*, 495 F. Supp. 2d 1038, 1041 (N.D. Cal. 2007) (citing *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993)). This requires courts to presume that public officials have discharged properly their official duties. *Id*. It is the burden of the party seeking to supplement the record to overcome this presumption by producing clear evidence to the contrary. *Bar MK*, 994 F.2d at 740; *Pinnacle Armor, Inc.*, 923 F. Supp. 2d 1226, 1232 (E.D. Cal. 2013). Put another way, to rebut the presumption of regularity, plaintiffs "must put forth concrete evidence" to show that the record is incomplete. *Pac. Shores Subdivision, California Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 6 (D.D.C. 2006) (cited in *California v. U.S. Dep't of Labor*, No. 2:13-CV-02069-KJM, 2014 WL 1665290, at *5 (E.D. Cal. Apr. 24, 2014)). Plaintiffs cannot meet their burden "simply by asserting that the documents are relevant, were before or in front of the [agency] at the time it made its decision, and were inadequately considered"; instead, plaintiffs "must identify reasonable, non-speculative grounds for [their] belief that the documents were considered by the agency and not included in the record." *Id*.

Plaintiffs assert that the presumption is "lost" when a plaintiff identifies wrongly omitted materials with specificity, and provides reasonable grounds for the belief that those documents were considered by the agency. This is true as to the wrongly omitted materials, but to the extent Plaintiffs suggest that rebutting the presumption as to one document (or even an entire category of materials) changes how the Court must review <u>other</u> materials, *see* ECF No. 48 at 2-3 (suggesting that Plaintiffs' have "overcome" the presumption in a general way and arguing there is no "reason to resuscitate the

presumption based upon [NMFS's] belated addition of certain documents"), the Court does not agree. In numerous cases, including many cited by Plaintiffs, the presumption is set forth as a foundational principle used to evaluate items or categories of items requested to be added to the administrative record. *See California v. U.S. Dep't of Labor*, No. 2:13-CV-02069-KJM, 2014 WL 1665290, at *4-5 (E.D. Cal. Apr. 24, 2014) (discussing the applicable rules, in light of the presumption, and then addressing those rules to specific items identified); *Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, No. C 17-05211 WHA, 2017 WL 4642324, at *4-5 (N.D. Cal. Oct. 17, 2017) (finding presumption rebutted where record was completely devoid of certain types of documents and court found it "not plausible" that no such documents were considered by decisionmakers, resulting in addition to record of specific documents presented to court *in camera*), *aff'd sub nom In re United States*, 875 F.3d 1200, 1206-07 (9th Cir. 2017) (holding no clear error in ruling that presumption was rebutted where certified record omitted documents), *judgment vacated on other grounds*, 138 S. Ct. 443 (2017). In some instances, courts discuss the presumption in a more general way when evaluating whether the record was compiled in such a wholly inappropriate manner as to justify discovery regarding what items may have been omitted from the record, *Forest Guardians v. Kempthorne*, No. 06CV2560-L(LSP), 2008 WL 11337359, at *3 (S.D. Cal. Apr. 1, 2008) (permitting discovery into completeness of the record where, among other things, plaintiffs identified several documents the agency conceded should have been part of the record, but, even after so conceding, agency nonetheless re-certified the record twice without including those additional documents), or when the record was certified under the wrong legal standard thereby justifying requiring the agency to perform an entire new search for record documents. *See Gill v. Dep't of Justice*, No. 14-CV-03120-RS (KAW), 2015 WL 9258075, at *5 (N.D. Cal. Dec. 18, 2015); *see also San Luis & Delta-Mendota Water Auth. v. Jewell*, No. 1:15-CV-01290 LJO GSA, 2016 WL 3543203, at *2-18 (E.D. Cal. June 23, 2016) (refusing to find that the record certification rebutted the presumption on its own in a global sense, instead evaluating each document presented for supplementation under the "clear evidence to the contrary" standard set forth in *Bar MK*).

Here, there is no request for record-related discovery and the Court sees no basis for a global finding that the AR needs to be re-built from the ground up because of a fundamentally flawed approach to compiling the AR. Accordingly, the Court takes the document-by-document (or category-by-category) approach.

**B.** **Deliberative Process Privilege**

Plaintiffs take issue with NMFS's exclusion from the AR of certain "deliberative and privileged materials." *See* ECF No. 42-1 at 2, 7-9; Declaration of Douglas Obegi ("Obegi Decl"), ECF No. 42-2, ¶ 4. Plaintiffs argue that these materials must be included in the record to ensure that the Court is able to review fairly NMFS's decision to exclude them. ECF No. 42-1 at 7. In support of this position, Plaintiffs rely on cases from the Northern District of California, a jurisdiction that requires an agency preparing an administrative record to include internal agency communications in the record and then produce a privilege log to justify exclusion of any records under the deliberative process privilege. *Ctr. for Food Safety v. Vilsack*, No. 15-CV-01590 HSG KAW, 2017 WL 1709318, at *3 (N.D. Cal. May 3, 2017). But, as the Northern District acknowledges, "there is a split of authority regarding whether internal communications and drafts are properly part of the record." *Id*.

> The D.C. Circuit Court, for example, has concluded that such agency deliberations are not part of the record, reasoning that "the ordinary APA cause of action does not directly call into question the agency's subjective intent." *In re Subpoena Duces Tecum*, 156 F.3d 1279, 1280 (D.C. Cir. 1998). Thus, "[a]gency deliberations not part of the record are deemed immaterial" "because the actual subjective motivation of agency decisions is immaterial as a matter of law." *Id*. at 1279-80. Likewise, several district courts in this Circuit have concluded that "internal agency deliberations are properly excluded from the administrative record...." *California v. U.S. Dep't of Labor*, No. 2:13-cv-2069-KJM-DAD, 2014 WL 1665290, at *13 (E.D. Cal. Apr. 24, 2014); *United States v. Carpenter*, No. 3:99-cv-547-RLH-RAM, 2011 WL 4763675, at *3 (D. Nev. Oct. 7, 2011) (denying request to include records to the administrative record where they related to internal deliberations or mental processes).

*Ctr. for Food Safety*, 2017 WL 1709318, at *3. This Court addressed this issue in a related case, following the lead of the D.C. Circuit and other cases in this District by declining to require deliberative

materials be included in an administrative record <u>as a matter of course</u> because doing so contravenes "the standard presumption that the agency properly designated the Administrative Record." *San Luis & Delta-Mendota Water Auth. v. Jewell*, No. 1:15-CV-01290 LJO GSA, 2016 WL 3543203, at *19 (E.D. Cal. June 23, 2016) (quoting *National Association of Chain Drug Stores v. U.S. Dep't of Health & Human Services*, 631 F. Supp. 2d 23, 27-28 (D.D.C. 2009)). That said, as discussed above, the presumption that the agency is asserting properly the deliberative process privilege may be overcome, by clear evidence to the contrary. Plaintiffs' specific arguments regarding the assertion of the privilege are discussed in greater detail below.

**C.**     <u>**Specific Document/Document Group Requests**</u>

The Court takes each document (or category of documents) in turn, using the numbering system applied in the Obegi Declaration. ECF No. 42-2.

- ***Document 5.a -*** *August 17, 2016 letter (attached as Exhibit B to the Obegi Declaration) from NMFS to Reclamation agreeing that reinitiation of consultation was required on long-term operations of the CVP and SWP under the terms of a prior BiOp.*

NMFS has agreed to add this item to the record.

- ***Document Group 5.b -*** *Documents regarding adaptive management of Shasta Reservoir and the Shasta RPA:*

> ***Document 5.b.1 -*** *August 2, 2016 letter (attached as Exhibit C to the Obegi Declaration) from Reclamation to NMFS regarding use of adaptive management relating to Shasta Reservoir operations and the Shasta RPA;*

> ***Document 5.b.2 -*** *August 17, 2016 concurrence letter (attached as Exhibit D to the Obegi Declaration) from NMFS to Reclamation regarding use of adaptive management to modify the Shasta Dam RPA; and*

> ***Document 5.b.3 -*** *Any subsequent Reclamation or NMFS agency records regarding the revised draft Shasta RPA dating to prior to adoption of the WaterFix BiOp.*

NMFS indicates that the record already includes item 5.b.1, and agrees to include item 5.b.2. As to item 5.b.3, the record reflects that counsel for Federal Defendants exchanged emails with counsel for Plaintiffs in an effort to clarify this request. *See* Declaration of Cathy Marcinkevage ("Marcinkevage Decl."), ECF No. 45-2, at ¶ 4.b.3 & Ex. 1. Those emails clarified that Plaintiffs believe the following

documents fall within the description of 5.b.3:

- A January 25, 2017 document authored by Reclamation in response to NMFS's draft proposed RPA amendment;

- A March 22, 2017 document authored by Reclamation commenting on NMFS's draft proposed 2017 RPA amendment;

- A file dated May 2, 2017 entitled "ShastaRPAMeetingSlides.pdf";

- A file dated March 24, 2017 entitled "ShastaWorkshop1 Notes_Responses.pdf";

- An email message dated May 2, 2017 to which the above two documents were attached; and

- A file dated May 2, 2017 entitled ShastaWorkshop2 Notes.pdf, transmitted to Plaintiffs on June 22, 2017.

NMFS agrees to add to the record all but the last document, reasoning that transmission of the last document post-dates the issuance of the WaterFix BiOP. Marcinkavage Decl. at ¶ 4.b.3. With respect to the last document, Plaintiffs point out that, while the document was not transmitted to Plaintiffs until after the issuance of the WaterFix BiOP, it was <u>created</u> before the BiOp issued and memorializes a meeting that occurred prior to the completion of the WaterFix BiOp. ECF No. 48 at 8 n.2. NFMS does not explain and the Court can identify no authority that suggests the date of transmission of a document to a third party is relevant to its inclusion in the administrative record. Finding no other basis for distinguishing the last document from the others Federal Defendants have agreed to disclose, the motion is GRANTED as to the last document.

- ***Document Group 5.c*** *Absolute and comparative results of NMFS's Winter-Run Life Cycle Model for every scenario analyzed with the Model in the WaterFix BiOp.*

    *5.c.1.   Absolute Model results from analysis of Scenario 1, Scenario 1A, Scenario 1B, Scenario 2, Scenario 2A, and Scenario 2B; and*

    *5.c.2.   Comparative Model results from analysis of Scenario 1A, Scenario 1B, Scenario 2, and Scenario 2B.*

NMFS agrees to include in the record the comparative model results referenced in 5.c.2, but asserts that the "absolute model" results referenced in 5.c.1 do not exist. Marcinkavage Decl. at ¶ 4.c. Ms. Marcinkavage provides a detailed description of how the Winter-Run Chinook Life Cycle Model ("WRLCM") operates. *Id*. In brief, WRLCM requires a "suite of input data," which in the case of the analyses performed for the WaterFix BiOp, included raw data provided by the action agency that varied according to each operational scenario to be evaluated. *Id*. at ¶ 4.c.1.A. Those inputs are otherwise available (as raw data) in the AR. *Id*. Critically, WRLCM is open source software that uses input data, applies commands, and then produces specified figures or outputs. *Id*. For the WaterFix BiOp, NMFS "identified metrics and visualizations" it deemed useful in providing information on the relative effects of the proposed action under the various modeled scenarios. *Id*. at ¶ 4.c.1.B. These relative comparisons were considered "more robust than absolute predictions from the model," so the WRLCM program was set to produce specific comparative outputs. *Id*.

> Because NMFS knew that interpretation of absolute results was an inappropriate application of the model, the R script was not developed to produce absolute predictions, and, in fact, could not produce such predictions without re-writing [the program] commands that would then need to be re-run. NMFS is not able to produce results that provide absolute values for application of the transition functions of the life cycle model since those results were not produced and would not provide a suite of information appropriate for interpretation.

*Id*.

Nothing in Plaintiffs' reply calls these factual statements into question. Plaintiffs point to a single line from page 798 of the BiOp, which states: "It is important to note that the [No Action Alternative ("NAA")] and [Preferred Alternative ("PA")] should be evaluated in a relative sense using the WRLCM, because relative comparisons are more robust than the <u>absolute predictions</u> from the WRLCM." AR A000802 (emphasis added). Plaintiffs maintain that the use of the phrase absolute predictions in this sentence indicates that absolute predictions were produced. *See* Second Declaration of Douglas Obegi ("2d Obegi Decl.") at ¶ 4.a. The Court does not agree. This is just as logically an explanation of why the

WRLCM was <u>not</u> used to run absolute predictions. Moreover, that sentence is followed by an

explanation that undermines further Plaintiffs' position:

> Moreover, it would be incorrect to equate outputs of the model as equating
> to actual numbers of fish in the Sacramento River. This perspective is
> adopted for several reasons: 1) the underlying hydrology of the NAA and
> the PA are based on CalSim model outputs that are a combination of
> historical hydrology and future expected hydrological conditions, but do
> not represent actual historic or future hydrology; 2) the WRLCM model
> and the models used to provide input to the LCM model that use the
> CalSim results (HEC-RAS, DSM2, and ePTM) require assumptions that
> would all need to be true; and 3) the WRLCM was not calibrated to
> produce forecasts of actual abundances. As a result, the WRLCM should
> be viewed as a tool that can provide guidance on the relative performance
> of the two actions, and the percent difference (PA – NAA)/NAA * 100%
> was computed for each of the 1000 model runs.

AR A000802.

More compellingly, Plaintiffs also point to the following paragraph on the next page of the

WaterFix BiOp:

> [R]esults from the original run (scenario 1) were informative in deciding
> what additional scenarios could provide further insight on different
> outcomes between the two CWF alternatives. <u>As an example, under the
> original run, the abundance for both alternatives diminished greatly after
> the succession of extreme drought years (1929 to 1937) but only the NAA
> population was able to recover abundance levels over the remaining time
> series.</u> The PA population was not able to replace itself and therefore not
> able to approach initial abundance levels throughout the remaining time
> series. This necessitated an approach to evaluate different scenarios for the
> alternatives to allow for thorough resolution of the model's habitat and
> survival relationships that may not have been realized under scenario 1 for
> the PA Alternative.

AR A000803 (emphasis added). Plaintiffs argue "this indicates that the [WRLCM] presents results

showing the absolute abundance of winter run Chinook salmon over the time period for any model run."

2d Obegi Decl. at ¶ 2. The Court agrees that this at least raises the following question: How can NMFS

state without using absolute figures that "abundance for both alternatives" under Scenario 1[3]

---

[3] Page 798 of the BiOp describes the various "Scenarios" modeled. AR A000802. Scenario 1, described as the "original
scenario run," assumes an initial abundance of 10,000, standard hydrology, and 5% "NDD near-field mortality." *Id*. The
Court presumes the acronym "NDD" stands for the proposed "north Delta diversion facility." *See* AR A000010.

"diminished greatly after the succession of extreme drought years (1929 to 1937)," but conclude that only the No Action Alternative population was able to recover abundance levels over the remaining time series? Were, for example, Preferred Action runs for one time period compared to Preferred Action runs encompassing additional or different years? The record is not clear on this point or on how NMFS could analyze the recovery of abundance levels over time using comparative modeling. Accordingly, on or before July 6, 2019, Federal Defendants are directed to file a supplemental declaration no longer than 4 pages in length clarifying how NMFS could reach the conclusions set forth in the immediately above-quoted paragraph utilizing only comparative modeling. Plaintiffs will have seven days from the date of NMFS's filing to file a response of equal length.

- ***Document Group 5.d*** *Comment letters from plaintiff Natural Resources Defense Council et al. regarding the BDCP, including:*

  > ***Document 5.d.1 -*** *2009 scoping comments on the BDCP (Exhibit E),*

  > ***Document 5.d.2 -*** *2014 comments on the draft EIS/EIR for BDCP (Exhibit F), and*

  > ***Document 5.d.3 -*** *2015 comments on the revised draft EIS/EIR for WaterFix (Exhibit G)*

Plaintiffs claim that these comment letters belong in the administrative record because they raise issues regarding ESA compliance of the BDCP and WaterFix and were transmitted to NMFS. Obegi Decl. ¶ 5.d.

NMFS refuses to add 5.d.1, a letter dated May 14, 2009 entitled "Scoping Comments on the Bay Delta Conservation Plan" which refers to an exhibit, dated May 30, 2008, regarding Scoping comments on the BDCP EIS/EIR," or 5.d.2, a 250-page letter dated July 29, 2014 entitled "Comments on the Draft Bay Delta Conservation Plan and DEIS/DEIR," on the ground that these documents predate the start of the Waterfix consultation. Marcinkevage Decl. ¶ 4(d). In addition, NMFS indicates that these documents relate to the BDCP, which was prepared under ESA Section 10, and the associated EIS/EIR prepared under NEPA and CEQA, documents and legal requirements which are "not at issue in [this] case." *Id*. Following this pattern, NMFS refuses to add Document 5.d.3, an October 30, 2015 comment letter on

the "California WaterFix/Bay Delta Conservation Plan Revised Draft Environmental Impact Report/Supplemental Draft Environmental Impact Statement" prepared under NEPA, because that document "is not at issue in the [present] case." *Id*.

There is limited precedent on this subject, but what precedent there is suggests that a request for supplementation of an administrative record cannot be based solely on an agency's consideration of the requested documents in connection with an earlier, related decision. *Safari Club Int'l v. Jewell*, No. CV-16-00094-TUC-JGZ, 2016 WL 7785452, at *4 (D. Ariz., July 7, 2016) ("Plaintiffs have not cited to any authority, and this Court could find none, permitting the supplementation of the administrative record based solely on an agency's consideration of evidence in connection with an earlier, related rulemaking."); *see also San Luis & Delta-Mendota Water Auth. v. Jewell*, No. 1:15-CV-01290-LJO-GSA, 2016 WL 3543203, at *3 (E.D. Cal. June 23, 2016) (refusing to order supplementation of the administrative record with documents contained within a prior administrative record on a related decision for an earlier timeframe absent information indicating the documents were actually considered, either directly or indirectly, by decisionmakers). Rather, the "touchstone" of the analysis "should be the decision-makers' actual consideration at the time of the agency action in question." *Safari Club*, 2016 WL 7785452, at *4; *see also Wildearth Guardians v. U.S. Forest Serv.*, 713 F. Supp. 2d 1243, 1256 (D. Colo. 2010) ("The proper touchstone remains the decision makers' actual consideration, and a party moving to complete the record must show with clear evidence the context in which materials were considered by decision makers in the relevant decision making process.").

As mentioned, "[t]he 'whole' administrative record . . . consists of all documents and materials directly *or indirectly* considered by agency decision-makers and includes evidence contrary to the agency's position." *Thompson*, 885 F.3d at 555 (emphasis added). A "plaintiff must identify reasonable, non-speculative grounds for its belief that the documents were considered by the decision makers involved in the determination." *Pinnacle Armor*, 923 F. Supp. 2d at 1239-40 (internal quotation omitted). The district court in *Wildearth Guardians* provided a helpful example:

> [I]f a party moves to include a study that was cited in the recommendations of subordinates, the party need not show that the decision maker read the study, but the party must show that the study was so heavily relied on in the recommendations that the decision maker constructively considered it.

*Wildearth Guardians*, 713 F. Supp. 2d at 1256; *see also Conservation Cong. v. United States Forest Serv.*, No. 2:13-CV-01922 TLN CMK, 2016 WL 10637090, at *3-4 (E.D. Cal. Oct. 12, 2016) (finding insufficient arguments based on inferences and common sense that agency considered a document; "concrete evidence" required to rebut presumption of regularity). Another helpful example is found in *The Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior*, which concerned FWS's designation of critical habitat for the piping plover. 667 F. Supp. 2d 111, 112 (D.D.C. 2009). The plaintiffs in that case wanted the agency to supplement the administrative record with an earlier BiOp covering the impacts to plover of a related federal action, namely the implementation by the National Park Service ("NPS") of an interim protected species management strategy for the Cape Hatteras National Seashore. *Id.* at 113. It was undisputed that the earlier BiOp was substantially relied upon by NPS when NPS developed the Cape Hatteras National Seashore's Interim Protected Species Management Strategy ("Interim Strategy"). *Id.* It was also undisputed that the Interim Strategy itself was before FWS when it designated the critical habitat for the plover. *Id.* However, FWS maintained it did not have the earlier BiOp before it when it designated the critical habitats. *Id.* Despite the facts that: (1) the BiOp was referenced in many documents that were in the administrative record for the habitat designation decision; (2) the BiOp acknowledged the critical habitat designation process and the impact designation would have on the Interim Strategy; and (3) the fact that some comments received on the critical habitat designation mentioned the BiOp, the court found that none of these references were strong enough to overcome the presumption that FWS designated properly the administrative record. *Id.* at 114.

Here, while the WaterFix proposal is certainly an outgrowth of the larger process of developing the BDCP, this fact alone does not mean that decisionmakers considered in connection with the development of the WaterFix BiOp every document that might belong within a hypothetical

administrative record for the BDCP process. As Plaintiffs point out, a number of BDCP-related documents already are in the WaterFix AR, including the 2013 draft BDCP itself (the draft ESA Section 10 conservation plan), AR B000483, and the BDCP EIS/EIR, AR C 14025. Generically, it makes sense that NMFS would have considered these central, earlier decision documents pertaining to BDCP, but would not necessarily have considered comment letters addressing those decision documents. Plaintiffs suggestion that the comment letters in question all should be included in the present AR because NMFS was required under NEPA to review and respond to these documents in the context of developing the BDCP EIS/EIR and because "these letters were directly related to the substance of the present controversy," Obegi Decl. at ¶ 5.d, is insufficient to demonstrate as a general matter direct or indirect consideration of the comment letters. Specifically with respect to Documents 5.d.1 and 5.d.2, the Court's review of those documents reveals that they cover a wide range of topics spanning the scope of the BDCP. While they do address and critique the components of BDCP that ended up becoming the WaterFix proposal, those critiques are not the dominant subjects of Documents 5.d.1. and 5.d.2. Accordingly, the Court cannot find that Plaintiffs have presented "concrete evidence," *Pinnacle Armor*, 923 F. Supp. 2d at 1232, to support a finding that NMFS directly or indirectly considered these comment letters in connection with preparation of the WaterFix BiOp.

The situation is different for Document 5.d.3, a comment letter submitted in response to the release in July 2015 of a re-circulated Draft EIS/R for WaterFix itself. *Notice of Availability of the Bay Delta Conservation Plan/California WaterFix Partially Recirculated Draft Environmental Impact Report/Supplemental Draft Environmental Impact Statement and Announcement of Public Meetings*, 80 Fed. Reg. 39,797, 39,799 (July 10, 2015). Although this comment letter addressed a draft document produced in connection with Reclamation and DWR's efforts to comply with NEPA and CEQA (as opposed to the ESA) regarding the WaterFix proposal, the comment letter directly and in an unambiguous manner points out Plaintiffs' specific concerns about WaterFix, including Plaintiffs' concerns regarding the impact of WaterFix on several ESA-listed species under NMFS's jurisdiction.

The Federal Register Notice inviting these comments indicated such comments were to be "reviewed and considered by all of the cooperating agencies," including NMFS. *See* 80 Fed. Reg. at 39,799. It is therefore difficult to understand how this particular comment letter could have escaped the attention of NMFS in connection with its preparation of the WaterFix BiOp at issue in this case. Although the final WaterFix BiOp did not issue until June 16, 2017, AR A000001, the consultation process that led to the final WaterFix BiOp formally began with review of a draft BA produced by Reclamation and DWR in October 2015. AR A000012. Document 5.d.3 is dated October 30, 2015. The Court therefore finds it beyond credulity that NMFS did not consider these comments in preparing the BiOp at issue in this case. The comments were before NMFS at the time the BA was produced. Therefore, even though NMFS denies having considered it in connection with preparation of the WaterFix BiOp, the Court considers this comment letter, authored by all or substantially all of the most prominent environmental/fisheries protection organizations involved in the BDCP process, to have been constructively considered by NMFS when it prepared the WaterFix BiOp.

Accordingly, as to Documents 5.d.1 and 5.d.2, the motion to supplement is DENIED. As to Document 5.d.3, the motion to supplement is GRANTED.[4]

- ***Document Group 5.e*** - *California Department of Fish and Wildlife 2012 "red flag" comments on the BDCP (attached as Exhibit H to the Obegi Declaration), which discuss potential impacts to salmon under NMFS's ESA § 7 jurisdiction.*

---

[4] Defendants point out, correctly, that Plaintiffs argued previously to this Court in connection with an Order to Show Cause regarding transfer to this District that judicial review of the WaterFix BiOp will have "little bearing" on issues connected with long-term operations of the CVP/SWP. ECF No. 45 (citing ECF No. 19 at 5). To the extent NMFS is arguing Plaintiffs are judicially estopped from asserting a contrary position at this stage of the litigation, the agency is incorrect. The Ninth Circuit has "restricted the application of judicial estoppel to cases where the court relied on, or accepted, the party's previous inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 783 (9th Cir. 2001); *see also Nat. Res. Def. Council v. Norton*, 236 F. Supp. 3d 1198, 1220 (E.D. Cal. 2017). Here, while it is true that Plaintiffs' present position regarding the relatedness of WaterFix to earlier regulatory activity runs counter to those prior statements, Plaintiffs are not barred by judicial estoppel from taking such inconsistent positions because the Court did not accept their earlier position regarding the relatedness of this case to other cases before the undersigned.

NMFS has agreed to add this to the AR, along with an email and attachment, dated April 3, 2012 and April 2, 2012 respectively, which, according to NMFS, contains the final comprehensive "red flag" issues from the Department of Fish and Wildlife. Marcinkevage Decl. ¶ 4(e).

- **Document Group 5.f** - *Technical assistance, email communications, and other records regarding NMFS's review of whether the draft BDCP would comply with the Endangered Species Act in 2014 and early 2015, prior to the announcement of the shift from the Bay Delta Conservation Plan to WaterFix.*

NMFS refuses to add documents meeting this description to the AR on the ground that, like the documents in Group 5.d, they pertain to the BDCP ESA Section 10 process, rather than the WaterFix ESA Section 7 process. Marcinkevage Decl. ¶ 4(f). It is undisputed that the AR includes documents related to the technical assistance NMFS provided to Reclamation and DWR for the WaterFix project beginning in February 2015 (i.e., once WaterFix had been spun off into its own, semi-independent project). *Id*. The documents targeted in Group 5.f. predate this period. Plaintiffs do not identify any specific technical assistance document, email, or other record produced during the early-stage BDCP process that would constitute "concrete evidence" to support a finding that NMFS directly or indirectly considered any such documents in connection with preparation of the WaterFix BiOp. Unlike with the 2015 comment letter (Document 5.d.3), Plaintiffs have not presented the Court with any specific documents to review on which a finding of constructive consideration could be based. As a result, the motion is DENIED as to Document Group 5.f.

- **Document Group 5.g** - *Documents regarding NMFS's approvals in 2014 and 2015 of CVP and SWP operations in the Delta that were not consistent with the Shasta RPA.*

As discussed above in relation to Document Group 5.b, NMFS has agreed to add several documents (and the Court has ordered an additional document added) to the record pertaining to modifications made to the Shasta RPA in 2016. Plaintiffs argue that the record should include additional documents pertaining earlier approvals by NMFS in 2014 and 2015 of Shasta RPA modifications. So far as the Court can discern, Plaintiffs do not point to any specific document as part of this request. Instead, Plaintiffs argue generally that documents related to the 2014 and 2015 Shasta RPA modifications should

be part of the record because NMFS's approval of those modifications is referenced elsewhere in the record. Obegi Decl. at ¶5(g). As an example, Plaintiffs point out that the July 2016 draft BA for WaterFix, which is part of the AR, reviews the history of drought management actions in 2014 and 2015 and then outlines "proposed future drought procedures" designed to better prepare for future droughts AR C061202 at 3-220 to 3-222. Similar references to the 2014 and 2015 modifications of the RPA can be found in the October 2015 draft WaterFix biological assessment. AR C059819 at pages 2-4 to 2-6, 4-17 to 4-19.

NMFS refuses to add any additional documents into the administrative record pertaining to the 2014 and 2015 Shasta RPA modifications, claiming NMFS did not consult any such documents in drafting the WaterFix Biological Opinion. [cite] The Court finds that Plaintiffs have not met their burden to establish otherwise. Marcinkevage Decl. ¶ 4(g). The mere fact that the 2014 and 2015 approvals are discussed in documents that are within the WaterFix BiOp AR is insufficient. *See Cape Hatteras*, 667 F. Supp. 2d at 114. While the history of RPA modifications is discussed in the draft BAs for WaterFix, nothing in those documents indicates that NMFS or Reclamation plan to utilize any of the mechanisms and/or procedures employed in 2014 or 2015 as part of any future drought operations under WaterFix. The motion is DENIED as to Document Group 5.g.

- ***Document Group 5.h*** - *Records of technical assistance from NFMS to Reclamation and the DWR from January to October 2015, including review of a draft BA produced in October 2015. (Responsive records would include meeting agendas, handouts, notes, and communications regarding the weekly consultation meetings referenced in the draft biological assessment.)*

- ***Document Group 5.i*** - *Documents regarding technical assistance from NMFS to Reclamation and DWR from January to July 2016 regarding the revised working draft BA for WaterFix.*

It is undisputed that NMFS provided technical assistance to Reclamation and DWR regarding the development of the WaterFix BA from January to October 2015 and again between January and the end of July 2016. AR A000012. As NMFS points out, the AR includes documents reflecting communications related to this technical assistance. *See* Marcinkevage Decl. ¶¶ 4.h & 4.i. Plaintiffs argue, however, that "the record does not appear to contain all of the technical assistance referenced in

the biological opinion." Obegi Decl. ¶ 5.h & 5.i (emphasis added). While Plaintiffs point out that the number of documents regarding technical assistance is not large, they fail to point to any particular document or category of documents they believe were erroneously omitted. This is insufficient to justify completion of the record. Therefore, the motion is DENIED as to Document Groups 5.h and 5.i.

- ***Document Group 7.a*** - *Any and all emails <u>sent by</u> Dr. Steven Lindley.*

This is the first of three categories of communications Plaintiffs assert were erroneously excluded from the AR. Dr. Lindley is the Director of NMFS's Southwest Fisheries Science Center in the Fisheries and Ecology Division and is the lead scientist responsible for the development and use of the Winter-Run Life Cycle Model (Model). As Plaintiffs point out, several emails <u>to</u> Dr. Lindley regarding the Model were included in the Record (e.g., B045571), but no emails <u>from</u> Dr. Lindley were included. Plaintiffs contend that "Dr. Lindley's email correspondence contains information about the assumptions and results of the Model regarding the effects of California WaterFix on winter-run Chinook salmon." Obegi Decl. ¶ 7.a.

NMFS offers the following lengthy explanation of the AR's treatment of communications to and from Dr. Lindley, in which NMFS explains: (1) the reason(s) why Dr. Lindley's role in the preparation of modeling for WaterFix was less central than Plaintiffs suggest; (2) they manner by which NMFS collected materials in the record so as to limit duplication of emails; (3) and the reason(s) why many communications to and from NMFS employees and its contractors were excluded from the AR as deliberative.

> a. A thread of emails at B_045571 includes an email from Dr. Lindley which provides an illustrative example of Dr. Lindley's limited involvement in model[]ing that was used in the WaterFix Biological Opinion. The earliest email in this thread notes a presentation given by Dr. Lindley regarding the model and results. A subsequent email asks Dr. Lindley a question regarding the results. Instead of responding to the email, Dr. Lindley forwarded the question to [Cathy Marcinkevage], stating, "Cathy Marcinkevage (NMFS WCRO) would have the details about the PA scenario versions analyzed--I think we are currently looking at two different ones."

b. The NMFS Southwest Fisheries Science Center's (SWFSC) Central Valley Chinook Life Cycle Model was the effort of a large (20+) team of staff, including NMFS SWFSC full-time employees (FTEs), University of California, Santa Cruz (UCSC) staff contracted to the SWFSC, and external staff contracted to the SWFSC. As head of the SWFSC's Fisheries Ecology Division, Steve Lindley is the primary investigator. Therefore, Dr. Lindley is often the public "face" of the model, providing presentations at workshops, conferences, and policy-level meetings (such as Collaborative Science and Adaptive Management Program meetings and California WaterFix principals meetings). However, the day-to-day management of model development was conducted by Eric Danner (NMFS FTE), who oversaw technical efforts of individual components required by the model, staffing by SWFSC and UCSC staff, and interaction with the NMFS CCVO, and Anne Criss (UCSC), who oversaw contracting, funding, and administration. The model team includes several outside contractors, including Noble Hendrix (QEDA Consulting), the lead developer of the actual life-cycle module of the model, and Russell Perry (U.S. Geological Survey), who contributed to development and calibration of certain modules.

c. NMFS SWFSC staff and contractors were asked to provide materials for the administrative record. It was determined that documents provided by Lindley, Criss, and Danner captured the full suite of information regarding the model since those staff interacted with both 1) the contractors (e.g., Hendrix, Perry, and UCSC contractors) and 2) CCVO staff. In order to avoid duplication, Lindley, Criss, and Danner were further instructed to exclude correspondence that included current or former CCVO staff (e.g., Marcinkevage, Strange, Rea, Redler, Swank) that had already submitted their responsive documents to the record, and whose submissions would have therefore already included any responsive communication with the SWFSC regarding the model, its development, and its results.

d. For purposes of the administrative record, NMFS considered these contractors to NMFS to be federal employees. Therefore, correspondence between NMFS and NMFS contractors was considered internal and deliberative. Any items that were limited in distribution to NMFS, NMFS contractors, or other Federal agencies that were not project action agencies were identified as internal and deliberative.

Marcinkevage Decl. ¶ 5. Plaintiffs make no effort to refute these specific assertions (and the Court can identify no basis for undermining them) about Dr. Lindley's role, the agency's search for email correspondence, or its assertion(s) of the deliberative process privilege as to any materials pertaining to internal correspondence about modeling. The motion is DENIED as to Document Group 7.a.

- ***Document Group 7.b*** - *Any and all intra- and inter-agency communications regarding the Defendant's review of the 2013 Draft Bay Delta Conservation Plan.*

Plaintiffs point out that while the AR includes some documents pertaining to the BDCP, it only includes four documents from before 2012 and excludes all inter-and intra-agency communications from 2014 and 2015 regarding whether the draft BDCP complied with the requirements of the ESA. Plaintiffs reiterate that, although the BDCP was proposed as a habitat conservation plan under ESA § 10, NMFS ultimately must analyze any habitat conservation plan under the standards set forth in ESA § 7 of the Endangered Species Act, which is the same standard used to evaluate the WaterFix biological opinion. *See Envtl. Prot. Info. Ctr*, 67 F. Supp. 2d 1117-18.

First, Plaintiffs offer no explanation why any additional documents from <u>before 2012</u> should be included in the AR. As to why the AR includes some but not all documents pertaining to the BDCP from 2014 and 2015, once again, NMFS's Cathy Marcinkevage offers a lengthy explanation in her declaration. She recounts the history of NMFS's interaction with DWR and Reclamation as the BDCP developed from a Public Draft in November 2013 to anticipated Section 7 consultation over the BDCP and through the period in late 2014 and early 2015 when the decision was made to transition from an ESA Section 10 permit for the BDCP to an ESA Section 7 consultation for WaterFix. Marcinkevage Decl. ¶¶ 6.a- 6.c. Marcinkevage pointed to a number of documents in the AR that reflect this pivot in approach. *See id*. at ¶ 6.d. She further explains that the AR includes pre-2015 documents that capture those major agreements or efforts that were part of the ESA Section 10 BDCP habitat conservation plan development process that were carried into the ESA Section 7 consultation on the effects of the California WaterFix project." *Id*. at ¶ 6.e. She provides further detail on the types of key documents from BDCP selected for inclusion:

> These documents include milestone types of agreements (e.g., negotiated agreements on south Delta operations, otherwise known as "Scenario 6 operations") between various stakeholders, or notable agency positions on project components (e.g., red flag comments and intake location siting decisions). These documents track the evolution of major components of the WaterFix proposed action and help explain why the final WaterFix proposed action contains the components that it does. In addition, the record includes those pre-2015 documents that track the evolution of the

23

analyses of the effects of the components that were eventually included in the WaterFix proposed action, including revisions to the Delta Passage Model ("DPM"), bench inundation analysis methodology, analysis of probability of reverse flows, revisions and updates to the SALMOD model, updates to analysis of sturgeon presence and growth, flows identified as sufficient to support salmonids and sturgeon to allow better evaluation of effects of the proposed project, technical evaluations required for new intake facilities, guidance on integrated effects analysis for the biological assessment, analyses and interpretation of temperature modeling results, and development of alternative operational scenarios.

*Id.* Plaintiffs offer no specific response to these explanations and generally fail to provide concrete evidence to justify ordering NMFS to supplement its record in the manner requested. Accordingly, the motion is DENIED as to Document Group 7.b.

- ***Document Group 7.c*** *- Intra- and inter-agency communications regarding technical assistance for draft WaterFix BAs in 2015.*

Plaintiffs indicate that the AR appears to contain only "three substantive emails and one supporting document regarding the Defendant's technical assistance for the draft [BAs] in 2015, despite the fact that NMFS participated in weekly section 7 consultation meetings during this time period." Obegi Decl. ¶ 7.c. As Ms. Marcinkevage explained, the AR already includes numerous documents pertaining to technical assistance provided by NMFS during this time period, including documents pertaining to the weekly consultation meetings. *See* Marcinkevage Decl. ¶¶ 4.h & 4.i. Plaintiffs again fail to point to any concrete information that suggests NMFS improperly excluded any information pertaining to technical assistance on the Waterfix BAs during this timeframe. Moreover, other than the generic legal arguments otherwise rejected above, Plaintiffs have not provided any information that indicates, let alone demonstrates, that NMFS is asserting the deliberative process privilege in an inappropriate way in connection with technical assistance documents. Therefore, the motion is DENIED as to Document Group 7.c.

### V. <u>CONCLUSION AND ORDER</u>

For the reasons set forth above, Plaintiffs' motion to complete/supplement the record is GRANTED IN PART AND DENIED IN PART AND HELD IN ABEYANCE IN PART. NMFS shall

file a supplemental declaration no more than four pages in length clarifying its position with respect to absolute model runs on or before July 6, 2019. Thereafter, Plaintiffs shall have seven days to file a response of no greater length. Upon the expiration of the response deadline, the Court will rule promptly. Meanwhile, NMFS should make efforts to add the agreed upon and ordered documents to the AR, as NMFS shall lodge either a revised or supplemental AR on or before July 20, 2017.

IT IS SO ORDERED.

Dated:   **June 22, 2018**                    **/s/ Lawrence J. O'Neill**
                                          UNITED STATES CHIEF DISTRICT JUDGE